**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ANDREW COOK,

          Petitioner(s),         **CASE NUMBER: 08-12520
HONORABLE VICTORIA A. ROBERTS**

v.

WENDY ANN SCOTT,

          Respondent(s).
_____/

**ORDER**

**I.    INTRODUCTION**

This matter is before the Court on Petitioner Andrew Cook's ("Mr. Cook") "Petition for the Return of Three Children to Petitioner and Request for Provisional Remedies Pursuant to the Hague Convention." (Doc. #1). Mr. Cook's petition is brought pursuant to the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610. The ICARA is the implementing legislation for the Hague Convention on the Civil Aspects of International Child Abduction.

Mr. Cook asks the Court to enter an order requiring Respondent Wendy Ann Scott (formerly Wendy Ann Jones) ("Mrs. Scott") to return his three children to Surrey, England.

The hearing set for August 20, 2008 is cancelled. *See* L.R. 7.1(e)(2).

Mr. Cook's petition is **GRANTED**.

**II.    BACKGROUND**

Mr. Cook and Mrs. Scott never married, but had a 23 year relationship. They are

1

the parents of: (1) Keaton Freddie David Gilbert Scott; (2) Kelsey Eileen Sheila Scott; and (3) Harry Andrew Scott. Their last names were "Cook" before Mrs. Scott changed them to "Scott," the name of her husband. The children were born in Carshalton, Surrey, England.

Mrs. Scott says her relationship with Mr. Cook deteriorated in October 2003 when a woman he was romantically involved with attacked her. Mrs. Scott believes Mr. Cook planned the attack and did not visit her in the hospital because he was planning her funeral. Mr. Cook disagrees. He says: (1) Mrs. Scott was attacked by a neighbor; and (2) he was not involved; two other individuals were convicted.

Nevertheless, Mr. Cook was removed from the family home in March 2006 by the police. The parties dispute the reason for the removal. Mrs. Scott says it was because he twisted her arm in the presence of the children; Mr. Cook says they simply argued.

The parties also dispute whether Mr. Cook saw his children after he was removed from the home. He says he continued to see them from March 2006 until March 2007. Mrs. Scott says Mr. Cook did not see them after March 2006.

The parties do agree that in June 2007 and August 2007, Mr. Cook registered with a contact center, a neutral location where children can be dropped off to eliminate conflict between parents. Mrs. Scott says she did not take the children there because Mr. Cook was allowed to pick them up from her home, but refused.

On September 14, 2007, Mr. Cook filed an "Application for an Order" in the Croydon County Court in England. He accessed Mrs. Scott's e-mail account (without her permission) and found e-mails that hinted at her intention to take their children to the United States. Mr. Cook asked the Croydon court for: (1) an order prohibiting Mrs.

Scott from removing the children from England or Wales without leave of the court; (2) a parental responsibility order; and (3) a contact order enabling him to re-establish his relationship with the children.

Mrs. Scott promised not to remove the children from the court's jurisdiction without Mr. Cook's written approval, and Mr. Cook promised not to: (1) smoke marijuana in front of his kids; or (2) access Mrs. Scott's e-mail account without permission. Based on those promises, the court entered a Contact Order on October 2, 2007 that requires Mrs. Scott to allow Mr. Cook contact with the children on alternate Saturdays from 10:00a.m. until 2:00p.m. Mrs. Scott says she offered Mr. Cook visitation also three days a week and partial weekends, but Mr. Cook declined.

Subsequently, Mrs. Scott traveled to New Hudson, Michigan to live with Carl Frederick Scott III ("Mr. Scott"), whom she met in an internet chat room and subsequently married. Mrs. Scott left the three children with her sister in England until early November 2007 when she arranged for them to come to Michigan. Mrs. Scott says her intention was to have them return to England after two weeks, but they did not want to leave her.

On November 12, 2007, Mr. Cook applied for another parental responsibility order from the Croydon County Court. The proceedings were transferred to the Principal Registry of the Family Division ("Family Division") on November 13, 2007. A Parental Responsibility Order was entered by that court on November 16, 2007. It states Mr. Cook shall have parental responsibility for the three children. His parental responsibility can only end: (1) when the children reach the age of 18; or (2) by court order. Mrs. Scott asks the Court not to give the order much weight because it did not

3

account for the well-being of the children, and it was entered by default because she left the country.

The Family Division also entered an Order requiring Mrs. Scott to return the children to the court's jurisdiction. Mrs. Scott has not complied.

## III. APPLICABLE LAW AND ANALYSIS

### A. Mr. Cook's Burden of Proof

Under the ICARA, Mr. Cook has to prove by a preponderance of the evidence "that the [children have] been wrongfully removed . . . within the meaning of the [Hague] Convention." 42 U.S.C. §11603(e)(1)(A). Article 3 of the Hague Convention says:

> The removal . . . of a child is to be considered wrongful where - a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident[sic] immediately before the removal . . .; and b) at the time of removal . . . those rights were actually exercised . . . or would have been so exercised but for the removal[.]

Mr. Cook must show: (1) Mrs. Scott removed the children from their "habitual residence"; and (2) he exercised parental custody rights at the time of removal based on the law of their "habitual residence." *See Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*").

#### 1. Habitual Residence

Mr. Cook says the "habitual residence" of his children is Surrey, England. Mrs. Scott does not indicate where she believes they were habitually residing at the time of removal, but says no residence order was in place.

Habitual residence pertains to the children's customary residence before removal. "To determine the habitual residence, the court must focus on the child[ren],

4

not the parents, and examine past experience, not future intentions." *Id.* at 1401.  They can only have one habitual residence.  Once that residence is set, it can only be altered by: (1) removing the children to a different location before the "wrongful" removal; and (2) the passage of time.  *Id.* at 1401-02.

The children: (1) were born in Carshalton, Surrey, England; (2) are British citizens; (3) attended school in Surrey, England; and (4) resided exclusively in Surrey, England until Mrs. Scott removed them to the United States.  Their habitual residence is Surrey, England.

Because Mrs. Scott removed the children from their habitual residence in early November 2007, the first prong of Mr. Cook's burden is met.

### 2. Parental Responsibility/Parental Custody Rights

Did Mr. Cook have parental responsibility under English law when Mrs. Scott removed the children?

English law says:

[w]here a child's father and mother were not married to each other at the time of his birth –

(a) the mother shall have parental responsibility for the child;
(b) the father shall not have parental responsibility for the child, unless he acquires it in accordance with the provisions of this Act.

Children Act 1989 (c.41) Part I, §2(2).  One way a father can acquire parental responsibility is if a court orders it.  *Id.* at §4(1)(a).  Although Mr. Cook filed an application for a parental responsibility order on September 14, 2007, he did not obtain an order until after Mrs. Scott removed the children.  Thus, Mr. Cook did not have parental responsibility under the Children Act.

5

However, on October 2, 2007, an England court prohibited Mrs. Scott from removing the children from England and Whales without Mr. Cook's written permission and granted Mr. Cook visitation rights on alternate Saturdays. That order grants Mr. Cook "custody" rights to his children under the Hague Convention. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1065 n.4 (6th Cir. 1996) ("*Friedrich II*") (citing *David S. v. Zamira S.*, 574 N.Y.S.2d 429 (Fam.Ct. 1991)); *see also* Hague Convention, Article 3 (custody rights may arise by judicial decision).

The next question is whether Mr. Cook was "exercising" his custody rights when Mrs. Scott removed his children:

> if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

*Friedrich II*, 78 F.3d at 1066 (citing 42 U.S.C. §11601(b)(4)).

The Court finds Mr. Cook "exercised" his custody rights since he sought to keep regular contact with his children. *See id.* at 1065. He lived with them until March 2006. He also: (1) registered with a contact center in June 2007 and August 2007 in an attempt to see his kids; and (2) petitioned an England court for visitation rights and a parental responsibility order.

Mr. Cook "exercised" his custody rights.

**B.    Mrs. Scott's Burden of Proof**

Because Mr. Cook met his burden, the children can only remain in the United

States if Mrs. Scott can prove one of five "narrow" defenses.  *See* 42 U.S.C. §11601(a)(4).

Three of the defenses can be established by a preponderance of the evidence: (1) Mr. Cook filed his Petition more than one year after the removal . . . and the children are settled in their new environment; (2) Mr. Cook "was not actually exercising his custody rights at the time of removal . . ., or had consented to or subsequently acquiesced in the removal . . ."; and (3) "the child[ren] object[] to being returned and ha[ve] attained an age and degree of maturity at which it is appropriate to take account of its[sic] views."  *See* Hague Convention, Articles 12, 13, and 13a; *see also* 42 U.S.C. §11603(e)(2)(B).

The remaining two defenses must be shown by clear and convincing evidence: (1) "there is a grave risk that [the return of the children will] expose [them] to physical or psychological harm or otherwise place [them] in an intolerable situation"; or (2) the return of the children "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, Articles 13b and 20; *see also* 42 U.S.C. §11603(e)(2)(A).

Mrs. Scott asserts three defenses:  (1) Mr. Cook was not actually exercising his custody rights at the time of removal; (2) the children object to being returned to England; and (3) there is a grave risk that returning the children to England will place them in an intolerable situation.

### 1.     Not Exercising Custody Rights

Mrs. Scott says Mr. Cook was not exercising his custody rights at the time of removal because he neglected the children for 17 months.

7

The Court disagrees. Even assuming Mr. Cook was absent for 17 months, the evidence does not show by a preponderance that he clearly and unequivocally abandoned his children. *See Friedrich II*, 78 F.3d at 1066. As late as September - October, 2007, Mr. Cook was actively engaged in court activity to see his children. Mrs. Scott removed them in early November 2007.

### 2. Objections to Being Returned to England

Mrs. Scott says she had return flights to England for the children after a two week visit in Michigan, but they objected to returning.

Their ages are 10, 9, and 7. The Court cannot consider their alleged objections because they have not reached an age of maturity. *See* Hague Convention, Article 13.

### 3. Intolerable Situation

Mrs. Scott says there is a grave risk that returning the children to England will place them in an intolerable situation. According to Mrs. Scott: (1) she and Mr. Scott provide for them emotionally and financially, but Mr. Cook cannot do so; (2) Mr. Cook exposed the children to domestic violence; and (3) Mr. Cook uses marijuana.

The Court disagrees.

First, an "intolerable situation" does not "encompass return to a home where money is in short supply[.]." *Friedrich II*, 78 F.3d at 1068 (citation omitted).

Second, it is not for the Court to determine where the children will be happiest; that decision is a custody matter reserved to an England court. *See id.*

Third, this case is distinguishable from *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000), a case cited by Mrs. Scott. The *Walsh* court held the petitioner's children should

8

not be returned because the petitioner: (1) has an uncontrollable temper; (2) engages in violent fights with individuals other than his wife; and (3) is likely to abuse children because he is a serial spouse abuser. *Walsh*, 221 F.3d at 220-22. There is no evidence that Mr. Cook: (1) actually twisted Mrs. Scott's arm; (2) constantly abused Mrs. Scott; (3) is violent towards other individuals; or (4) has a temper.

Fourth, Mr. Cook is expected to abide by his promise made to an England court that he will not smoke marijuana in front of the children. Even assuming he breaks the promise, however, smoking marijuana does not create a "grave" risk to the children. *See Friedrich II*, 78 F.3d at 1068 ("The person opposing the child's return must show that the risk to the child is grave, not merely serious.").

Finally, the Court trusts that an England court can determine whether Mr. Cook is a suitable father, and can award Mrs. Scott custody of the children in the United States if he is not. *See id.*

## IV. CONCLUSION

Mr. Cook's motion is **GRANTED**. Mrs. Scott must make suitable arrangements to return the children to Surrey, England before August 5, 2008. She may then seek custody of them in an England court. *See* 42 U.S.C. §11601(b)(4); *see also Friedrich I*, 983 F.2d at 1400 ("a United States district court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.").

**IT IS ORDERED**.

                               s/Victoria A. Roberts
                               Victoria A. Roberts
                               United States District Judge

Dated: July 31, 2008

The undersigned certifies that a copy of this document was served on the attorneys of record and Wendy Ann Jones by electronic means or U.S. Mail on July 31, 2008.

s/Linda Vertriest
Deputy Clerk